Mr. Lawrence. May it please the Court. My name is Kyle Lawrence. I'm here on behalf of the appellant Jose Carmona. The issue in this case is whether due process permits Texas to exercise specific personal jurisdiction over a defendant, here Leo Ship Management, that traveled to Texas to conduct business in Texas and while it was physically present in Texas, negligently caused physical injury to a Texas resident. The District Court appears to be the first in this circuit or anywhere else we've been able to find to refuse to exercise specific personal jurisdiction in these circumstances and that was error. However you articulate the standard for specific personal jurisdiction, whether it's under the classic international shoe case, more modern precedents, Goodyear, Walden v. Fiore, or under this Court's Elkhart precedent, the voluntarily entering into a forum and committing a tort while there is a sufficient minimum contact and that bedrock principle requires reversal. Does this case turn on the question of whether at the beginning of the voyage they knew that they were headed for Texas? I don't think it does because their position is that they were actually directed to go to Texas by a charter. So at the moment they are told to enter Texas and they voluntarily do so. I think that actually controls this case. So their option, if you're right about that, then their option at that point would be just to break the contract and say we're not going because we don't want to go to Texas? That's correct, Your Honor. So I think the voluntary entry is the key here and a contractual obligation to go to the forum and do something there is no different than a normal agent entering the forum on behalf of a principal and we know from, for instance, this Court's Seaforth decision that that agent-principal relationship doesn't negate personal jurisdiction as to the agent. If you want to look at the case from the perspective of at the time they entered into the original ship master agreement or ship management agreement, then this starts to look a little bit more like one of the stream of commerce cases where a manufacturer creates a product and asks the distributor to distribute it to any one of the 50 states. And under this Court's stream of commerce cases, I think you still get to, let's call it purposeful availment. It seems to me the district court made two assumptions. Either one would support its ruling. One is that this is a third-party case, that Leo is back in Manila and as to its people, it's really like a hurricane diverting the ship. They had no expectation it would ever end up in Houston. And in that sense, it was a pure fortuity. Is your answer that regardless of fortuity, a non-resident defendant's tort will always give personal jurisdiction? Or do you contemplate things like the hypothetical in, I'm pronouncing it, Nuovo's, do you contemplate that there might not be personal jurisdiction if bad weather diverted a ship that was going to a different destination? You understand my question? I do. So I think the the diversion hypothetical, and I want to be clear, that's, I don't think that's the facts that we have here, but I want to answer the Court's question. I do think for torts of this type, where physical injury torts in the state committed by the non-resident, essentially here, the employees acting in the scope of their employment, I actually do think you still get personal jurisdiction even if you're somehow in the forum on accident. And the reason you get that is because of the nature and quality of the act. We know this from International Shoe, which looked to Hess v. Pulaski, another negligent personal injury case, and said that case really isn't about implied consent being in the forum. What it really is about is the nature and quality of the deliberate. Does the restatement or do any treatise talk about whether these are always separate necessary elements? The act plus scienter deliberateness, as opposed to involuntary forced in. So the quick answer to your question is no, I don't think the restatement says anything about are these discrete elements. Our position is they really aren't. The way to think about this is the standard is minimum contacts, and the purposeful availment doctrine helps you determine when, in certain types of cases, contacts have been established or which contacts are attributable to the non-resident defendant. But purposeful availment first came up in Hansen v. Dinkla, which expressly said this is not a case where somebody enters the state and commits a tort there. The Colco decision from the Supreme Court also makes that same distinction. And in the case of the Dinkla case, it doesn't say the term purposeful availment anymore at all. The question is the connection between the defendant and the forum and the litigation. And it points to, I think it was Calder in saying that. We probably don't have to decide that as an absolute rule, right? If your position is that this, LEOS does global activities, they profit around the world, the ship management agreement contemplated they would go to other ports, and then they were notified before they actually entered it. And you would say that constellation even does meet voluntariness. Exactly. I think there's an even easier way to decide this, which is to say at the moment they were directed to go to Texas, and they were actually in Texas, they were only targeting then one forum. They're sort of per se targeting Texas by knowingly and voluntarily entering the forum. And so even if there's sort of a master agreement in the beginning where they contemplate, we'll go anywhere on your behalf, and then there are sort of subsequent communications, go to these specific places. As to that subsequent communication, I think that's the time at which you can definitively say you're voluntarily entering the state, you know, knowingly do so. So this isn't really at all like the kidnapping hypo or a hijacking hypothetical. I want to focus a little bit on the factual record here because I think it's dispositive. Under this Court's Elkhart precedent, voluntarily entry into the forum and commission of a tort there is sufficient. I don't think they fight the Elkhart precedent. What the real fight is about at this point is the state of the factual record and the degree of voluntariness that was actually occurring in the record. And I want to make the point very clear that they were not somehow kidnapped or compelled to enter the forum against their will. And we know this by looking at the CRM manual in the record, specifically sections three and four of it. Section three, which specifies they employ the captain of the boat. In other words, they were driving the boat. So it's not like their crew had no choice as to where the boat was going. They weren't powerless to avoid Texas. And section four as well makes the same point with respect to the second officer. The second officer was the one that shall make the passage plan and assist the master in following the order. It's also true that they lack control in the sense that they didn't control the destinations on the itinerary. They were directed by the principal to enter the Texas forum. What did the ship management agreement say about ports? The ship management agreement doesn't identify specific ports. It does say in section 9 that the owner and LEO shall maintain constant communication about the ship's schedule and port information. It also requires LEO to follow the law of whatever forum they happen to be in. So it doesn't identify specific ports, but it certainly contemplates that they would be entering ports around the world, and they're expected to follow those the legal obligations of each each forum. Is your argument consistent with our precedent that they cite Sarko, Sangha, those cases where we didn't find personal jurisdiction? It is. So I want to sort of cabin one group of cases, which are contract cases, where the only connection to the forum is a breach of contract cases, where the only connection to the forum might be you negotiated a contract in the forum. And this Court has recognized several times, I think D.J. Investments and the Trois case, that the contacts analysis for contract cases and tort cases is distinct. So I want to lop off the contract cases. That would be a Sarko, and put it to one side. And then Sangha is a case where it was a tortious interference claim based on communications directed at an individual in the forum. So there you have tortious conduct occurring out of state and effects occurring in state. Here we have conduct and effects all occurring in state, and it's that set of facts that we haven't been able to find any district court to refuse to exercise specific personal jurisdiction. And again, the tortious conduct occurring in the state, to put this in the terms of Walden versus Fiore, that creates a strong connection between the defendant and the forum. I want to respond a little bit to some of the things that Leo says in its brief. The first thing Leo says is that it hasn't targeted Texas. And to be clear, the intentional targeting requirement comes up in these stream of commerce cases where the conduct occurs outside of state and somehow directed at the state. That's not this case. This is a case where the negligent conduct occurred in state. So I think you have per se targeting of the local forum. The other thing Leo says is that Texas was wholly irrelevant to what it was doing in the state. I don't want to be glib about this, but I don't think that's right. They certainly couldn't have done this job in Utah, for example. The other thing they say is that, excuse me, I actually want to move just briefly to the doctrine of purposeful availment. And I don't want to rehash too much of what has already been covered in the briefs, but I only want to say the doctrine of purposeful availment, the case law recognizes two cornerstones to it. The first one is foreseeability, whether the nature of a defendant's contacts are such that the defendant can reasonably anticipate being called into the forum for litigation. And that's absolutely satisfying. The way you can see that very easily, I think, is the dueling Scalia and Brennan opinions in the Burnham case. Because the court split 4-4-1, but the one point on which they all agreed was that voluntarily being in a particular state, a defendant who is voluntarily there has a right to litigation for their conduct in that state. And the second cornerstone to purposeful availment is sort of this fairness or quid pro quo concept, the idea that you're driving benefits over the protections of a forum's laws. And that's also satisfied here because Leo avails itself of the forum's benefits and protections when it enters and uses the infrastructure of the port. It's protected by Texas's police, fire, safety, and they also have access to Texas courts. So if the worlds have been reversed and a stevedore had injured one of their employees, they presumably could have sued in Texas for that negligence. Unless the court has any questions, I'd like to preserve the balance of my time. Was there a hearing below on this? No, there was no evidentiary hearing. There was limited written jurisdictional discovery. And so the record right now is rather slim, about 50 pages. But there was no evidentiary hearing, which is why we have a prima facie burden at this point. Just again, I ask these because you know the case. It sounds like you know them very well. Could you speak to the footnote? Footnote 2 in Nuovo. Sorry for asking about a footnote again. So I'm going off memory, but is footnote 2 in Nuovo about rule 4k jurisdiction? Footnote 2 is where it contemplates sort of the bad weather causing fortuity. So you end up in the harbor. Tort could happen. As I read that footnote, it may not have been essential to the holding. That footnote implies that you could have precisely the scenario you do here, but there wouldn't be purposeful availment if it were the hijacking, bad weather, emergency type. So Nuovo, first of all, is a breach of contract case where it was, the claim was I think by an insurer against the ship owner or manager. It wasn't a case, the hypothetical wasn't contemplating as the defendant who actually enters accidentally say Florida instead of Louisiana, them not somehow being responsible for their conduct there. So I do think that if somehow you were waylaid and you end up in Florida accidentally, or let's say you're in New York and you get on a wrong train, you end up in Connecticut instead of Massachusetts, if you get off the train and assault someone, I think you're still going to be subject to that forum. And the reason for that is the nature and quality of that contact. But again, that just factually isn't what we have here. All right, thank you Mr. Lawrence. You say time for rebuttal? Mr. Nassau? Good morning, Your Honors. This is an unusual case, perhaps an extraordinary case, where we acknowledge that we are being alleged to have committed a tort within a forum, yet arguing that the local courts could have no jurisdiction over us. I hear Mr. Lawrence. Why did the vessel dock where it did? I'm sorry, Your Honor? Why did the vessel dock where it did? Because the charter of the vessel directed the captain to navigate it to that port. And the pipe, was the pipe being delivered to Texas? The pipe was being delivered to Texas. Where did that pipe come from? It's not in the record and I don't know. Was it designated to go to any place other than Texas? I don't know that. That would be within the charter. Well, it is not fortuitous that the product and the load of the vessel was going to Texas. That's correct. It just happens that one of the participants in the voyage itself didn't know that? Well, the charter certainly knew. The charter was in charge of the boat and directed it to Texas and directed the product there. Whether the crew that was working in the vessel knew that or not is not in the record. So, what I'm getting at is going back to purposely avail and that sort of elastic concept that we struggle with. You have a situation where that vessel, it's not fortuitous that that vessel is going to Houston, Texas. It has a load on there that's going to be delivered there, right? That's correct. And it has to be the load, the longshoremen, I guess, or whatever, that were injured and trying to offload it. But, who owned the pipe? I don't know and it's not reflected. Okay. So, what is the fortuitous about this? What's fortuitous is that they sued the crew of the vessel. They did not sue the vessel or the charter or the owner of the vessel. Those other parties would have had them in contact with Texas. They chose not to sue them. Well, maybe fortuitous is the crew that, but when they bought a vessel and it's bound for a port to deliver to a product to a designated port, whatever may be their internal contractual paperwork, there's nothing fortuitous about where they were going. So, it comes down to whether they were aware or not. Apparently, they didn't care because of whatever. If there had been evidence in this case that the crew was aware the vessel would be going to Texas before the voyage commenced, I think that would be the case. The only evidence in this case is that the crew became aware one day before the accident that it would be coming into port in Texas. That is the only evidence in the record. That's a sort of elastic loop. So, during the voyage at some point it becomes deliberate and aware, but at the beginning it doesn't? The evidence is, and again we're dealing with a very limited record, this was not an evidentiary hearing. The question that was asked in written discovery was, were you aware on the day before the accident that the boat would be coming into port in Texas? We answered that question, yes, because as of the day before we were aware. But the ship management agreement also contemplated you would always be told. Section 9. So, that wasn't just sort of an admission you made, it's consistent with the agreement. Well, and the facts, I think Mr. Carmona is also presuming that we had control of the navigation of the vessel. That's also not reflected in the record. But, so your position legally, and you're candid in the brief to say there's no case to support it, is that if one of your clients gets on, he said the wrong train, or is on a plane and hijacks, it lands and then they physically assault somebody? Texas doesn't have an ability to vindicate? Is that the position? The fact that you can draw a line at some point between negligence, which are the claims at issue in this case, and an intentional tort. An intentional tort implies some voluntariness on the part of the actor. So, I think if we had made a voluntary choice to be in Texas, if we had gotten off of the boat and committed a tort, that would be different. These are negligent acts that we are accused of. Why would it be different? Because it implies voluntariness. We're not accused of doing anything voluntary. We... Oh, you were involuntary? Oh, sure, but I'm suggesting to you that you characterize yourself as just a sort of a pawn to an agreement that would take you wherever the vessel was going, right? And from the very beginning, the vessel was headed to Texas with a product that that ultimately would... the handling of which led to an injury in Texas. I'm having some difficulty with the, quote, fortuity of that. This has everything to do only, to me, with the internal arrangements or whatever. They would agree to go wherever the vessel went, right? Right? And from the very beginning, this voyage was to Texas. The only reason they didn't know is they didn't ask. Is that right? I don't know whether they asked or not. The record is very slim, and that is part of the frustration of this case, I understand. But you're giving us... You're important. It's important. You're trying to tell us the rule of law. So, the limiting principle, I've heard you say, is had your crew member, instead of inspecting the net where the pipes fell from, turn around and hit Karmov, that intentional tort, there would be jurisdiction. But this more negligent act of looking at the nets and they are not secure, is... Perhaps. I think at some point, if the tort is intentional, they know they're within the forum. Maybe they don't have to know they're in Texas, but I think certainly if you undertake an intentional tort, there is a difference. There is a case law to draw that distinction. I'm not thinking of a case that deals with the line between intentional and negligent. What I'm coming back to is perhaps the, you know, the Novo Pignone footnote, too, I think is probably the closest example we have, where... What was the context of bad weather truly, you know, sort of an act of God? It's something beyond the party's control. And our position here is there... We explicitly denied, we presented evidence in our motion, that we had no control over the movement of the vessel, and there was no evidence to controvert that. All they presented was the management agreement, where we agreed to provide a crew, and then... So for Carmona to get relief, he has to go to the Philippines to sue? Or where is... He should have sued... He should have sued the parties in control of the vessel. The charterer, the owner, he can sue the vessel in rem. Well, where can he sue your crew? If he wants to sue our crew members, he would have to sue in the Philippines. But his recourse should not have been against us. I mean, it certainly could have been if he wanted to go to the Philippines. His recourse was against the charterer, the owner of the vessel itself, or against his own employer under the LHWCA. So let's examine just a minute, again, this intentional versus negligent act, and you understand why we have to explore all these, because if we're going to write an opinion, we need to specify exactly what lines we're drawing. So let's take the train example. It ended up at the wrong station. Walks into the station and negligently bumps up against another passenger and injures that person. Negligence, tort. I think if you've left the train, or if you've left the vessel, you've made a distinction to be made. In this case, we never left the vessel. For all we know, the crew didn't know where they were. We, Leo, knew where they were because we acknowledged that at least one day before the accident, we knew we'd be coming into port in Texas. But in the train making an emergency stop scenario, if you make the voluntary choice to get off... Your argument essentially is that because your agreement was to do your job wherever the vessel may go, that when the vessel is transported throughout its voyage at the destination that was here, that because, although you agreed to anywhere, you had an agreement that it's going to Texas. Although, is that it? It just comes down to whether you... We don't know whether the agreement contemplated we'd go to Texas. The agreement contemplated it would go wherever that vessel went. It would go wherever the vessel went. Why isn't that in and of itself an availing yourself of the port of Texas? It's wherever. I mean, the fact, if they had said specifically that, you know, their knowledge that they were going to Texas, there'd be a different case, wouldn't it, for you and your argument. Right? That if we knew where the vessel was going? Yes, if you said we're going to Texas and... That would be different. It would be different. But instead, they didn't say we're going to Texas. You said we're going, I'm going, your client's going, wherever this vessel goes. So that comes down to that distinction. It starts to sound like we're drawing more of a parallel to a SARCO, where the charterer in that case was likewise going along, I'm sorry, the manager in that case was going along wherever the vessel was going. They'd lost the cargo at sea, and this court held no jurisdiction because at that point... They lost the cargo at sea, yeah. That's true, but... That's a little different. The pipe didn't go overboard. The pipe was aboard the vessel as it was intended to be under the charter from the very beginning. So I'm just trying to press the point. I'm the one way or the other to isolate... This is a tough case, frankly, and I'm just trying to be sure I understand the principle that there is some tension between the notion of purposeful availment, and if you had known that the vessel... You say you didn't know that. The documents didn't say that. So at some point, you're suggesting that at some point in the voyage, somebody changed the destination to go to Texas, and you don't even suggest that. You're saying that this vessel was going to Texas, and you had agreed to go wherever it was going to go, but we don't know whether or not you people knew you're going to Texas all along. That's right. Oh, you got a paperwork. All we've got is the agreement to provide a crew that goes with the vessel. We acknowledge that at least by the day before... So as long as you have that kind of paperwork, then no matter what you may or may not have known, you escape the reach of the... I think part of the issue in this case is purely evidentiary, in that the plaintiff did not ask all the questions he ought to have asked, and perhaps did not present all the evidence he ought to have presented. If he had asked the question of how long back did we know the vessel was going to Texas... Well, should we remind the case for an evidentiary hearing on the evidence? I don't think that's necessary, because Judge Lake's opinion was correct. He came down and said there is no evidence that Leo Ship Management had control of the vessel and had any say in where it would go. There is no evidence that we did. Under these circumstances, the ruling was correct. It's a prima facie case, but if they don't at least present some evidence, then there is nothing to reverse. It was the correct decision, because there is no evidence that we had that kind of control. There's no evidence that it was a voluntary act, and without a voluntary act, it certainly can't be Texas. How can it be an involuntary act? How can it be involuntary? He said it would go anywhere. Nothing involuntary about that. They weren't in Texas involuntarily. You don't argue that, do you? It's not involuntary in the sense that we were with a gun to our heads or something, but we didn't have control of it. We couldn't opt out of that. So it comes down to, you say, because you didn't control the destination. We didn't control the destination, and we didn't control the vessel. I understand you didn't control the vessel, and so you're not amenable to process. At some point, if we're saying we're along for the ride, and you can take us wherever... The whole crew's along for the ride. The concern is that suddenly we'd be subject to jurisdiction anywhere without more, without any further contact. No, only where it goes, where the vessel's at. What we're talking about here is not just anywhere. It's the chartered passageway. You're delivering the product where it was supposed to go, and your client was the one that, I think, that loaded it again with, or may have subbed it or something, but they were responsible for that cargo, right? And what you're saying is that because under our agreement, they could have gone anywhere else, I guess. It's kind of strange, because the cargo was bound. Well, the charterer decides where the cargo is bound. The charterer tells the vessel where to go. We're there to load and unload and maintain the ship. What does that do to the arrangements? Doesn't that set up just an insulation from the breach of the long-arm statute? A breach of the long-arm statute? I mean, that is, it takes, it denies Texas's jurisdiction over the people who directed us there, the people who did have voluntary contacts, such as the charterer, the vessel itself, or the owner. And what's their liability? The same as ours. Under the Longshore Harbor Workers' Compensation Act, the vessel is defined as including all of us. They could have sued all of us. For some reason, they sued only the crew, the Filipino crew. That was their discretion, but I think they lost out on something by doing that. Why? Do you know, you know, why that was prosecuted that way? I don't know. I don't know. I want to just very briefly, because this is something that came up in the plaintiff's reply, is this assumption that we did have navigational control over the vessel. I think they're reaching into the contract and seeing something that isn't there. We did provide that CRM document that lists the various responsibilities of the crew. The contract also gave us a right to subcontract. It's not clear whether Leo employed the captain of the vessel or not. They're making that assumption that there is no evidence that we did, and so there is that. We have long maintained the position that the captain was not ours. It's not in the record one way or another, but it was their burden to present that evidence that we did have navigational control. They didn't do so. We denied it, so I think their prima facie evidence fails in that regard. I do want to spend just a moment talking about sort of our last issue, which is that even... Let me have one more question. Forgive me. Just one question. What exactly did your clients... What was its responsibility when it was aboard the vessel? Aboard the vessel, it was to... I mean, our men were tasked with maintaining the vessel itself, assisting, I believe, with loading and unloading. To some extent, I can't say that with certainty. I'd have to look back at the management agreement. But it's basic crew-type responsibilities aboard the vessel. And there's nothing in the evidence that says exactly which crew members we supplied and if there were any that were subcontracted out to other vendors. If there were a crew that were subcontracted out, those subcontractors would be answerable to the charter rather than us. Just briefly on the issue of different claims, Mr. Carman has been emphatic that he has only one claim. It is a negligence claim, and we're just trying to break that into multiple breaches. That is not so. He alleges breach of at least seven different negligence duties. Some of those clearly arise from acts that allegedly were committed in Texas. Some of them do not. For example, duties to properly stow the pipe aboard. There's no evidence that that was us. We expressly denied that it was us, and in fact we've explained who it was and that it occurred overseas. Duties like those, those are separable claims because they arise under different legal standards. It's not all one indissolvable claim. There are actually seven claims in this case. Some of them, if they're able to show minimum contacts with Texas, might well arise from those contacts. But many do not. And so this court, if it's going to reverse any part of this, at least has to make that claim-by-claim assessment. As I mentioned, Your Honors, there was recourse here. Mr. Carmona did have the ability to sue in Texas for his injuries. He could have sued the charter, the owner of the vessel NREM, or his employer under the same act he sued us under. He did not. He chose to sue us, an entity that did not have purposeful contacts with Texas. If the allegation is that the pipe was stowed improperly and negligently, wouldn't that injury be realized when you attempted to offload it and were injured as a result of original conduct that's now been continued in the Texas? Are you asking where the tort would occur or the injury would certainly occur in Texas and it might be able to be actionable there? The difference under these circumstances is that that alone, those contacts, could not give rise to purposeful I'm just trying to get all the contacts that are there so, or not, and we'll try to struggle with what's sufficient. But what you have then is what we've described previously. But you also have a negligent act which arguably would continue to stow properly and be ultimately realized only after you had arrived at where they knew where they were and did not correct it. And so I'm just suggesting is there some... Well, and it may bleed over into the turnover duty. If there's a duty for us to inspect the load before we let the stevedores on, if that is something that happens in port, then that's different from what I personally think of as stowing, which is loading it into the vessel, which occurred someplace else by someone else. I understand. I was just raising the suggestion to you that that consequence is only realized when that's a negligent condition that's realized in the port itself. Certainly, and probably not unlike a tort that's committed out of state that has effects in the form. You come back to that purposeful analysis. Was there actually something directed, intended, voluntary done? I understand. Thank you, Your Honor. Thank you, Mr. Masso. Mr. Lawrence, you've saved time for rebuttal. I'd like to walk through a couple points in rebuttal here. The first is the evidence that the crew only was aware, or the answer that we were aware by Leo one day before that we would be entering Texas does not amount to evidence that they only learned one day before. They presumably learned further back. We may not know anything. I think their argument is control. They didn't have any control over it. Control over the entry into Texas? Or the choice of Texas. I think that's factually wrong. I think they are treating the vessel as some separate entity that was moving, I guess, of its own volition. We do treat the vessel as a separate entity. Sorry? We do treat vessels as separate entities. As far as I know, they don't drive themselves, though. And Leo employed everybody from the captain who was driving down to the mess man. Well, Mr. Masso says you just didn't ask the right question. By asking the question about one day before, you didn't establish enough about previous knowledge. I don't think that's true. First of all, the ship management agreement especially contemplates or says that they would maintain constant communication about where the ship was going. So given that there hasn't been an evidentiary hearing and all the inferences are drawn in our favor, I think we've made the prima facie case that they voluntarily entered into Texas. Legally, I'm not sure it's relevant how far back they needed to know in advance that they were entering Texas. At the point that they're told to and they voluntarily do, I think that's enough. Really, the question is about voluntariness, not necessarily when at one point they learned about Texas being the destination. Why did you sue this particular entity? My understanding is that there were limitations considerations as to maybe some other defendants, but I don't have the full knowledge of the strategy behind that. I don't think it's unreasonable, though, to sue the entity that actually negligently harmed you. Well, you brought yourself a bucket of problems you wouldn't otherwise have, but I didn't know why you did it. Again, my best answer or my understanding is it had something to do with limitations considerations. Okay. Disputes between the two, the Filipino and the Japanese, would have been arbitrated in Japan. The breaches of contract, right, for the ship management agreement. That wouldn't bind you, a third party, Carmelo, correct? Right. And we're not suing them for a breach of the ship management agreement. We're suing them for negligence that occurred in Texas. But so, again, at a simple broad level, you're not writing out of the purposeful deliberateness element. You just think there was enough there when you looked at your prima facie case? Exactly. I think there's sort of two ways conceptually to think of this. One of them is that the standard is minimum contacts, and we know that voluntarily entry into a state and commission of the tort there is a sufficient contact. And so you don't need to undertake some sort of separate, discrete availment analysis that might ask for all sorts of considerations in the sort of directed tort cases or the contract cases. Another way to think of this is when you enter the forum and commit a tort there, purposeful availment is already satisfied. What about with your limited time is argument about claim to claim? You would agree that we would have to assess jurisdiction as to each claim? I agree. Yes. Under Safe Earth, it's claim by claim. I don't think we have seven discrete claims. We have seven factual theories as to why they were negligent and breached their duties under the LH. So what's your best case for that? I would probably analogize to the case law surrounding when you have a partial judgment or a final judgment. And I believe the rule is judgment on one factual theory isn't necessarily going to cover the entire claim. You can still have other factual theories. But it's also, I think, factually just wrong to say that the stowage negligence occurred entirely outside of Texas. That's somehow been proved at this stage. And again, we'll have to prove personal jurisdiction by preponderance of the evidence later. But right now, it's just a prime factual case. And if you look at the ship management, excuse me, the CRM manual, section four, I think, covers this quite well. It incorporates something called a cargo loading manual, I think, and refers to that. It obligates the ship's crew to maintain safe conditions for cargo loading and unloading. It says they're going to patrol the target area all the time. They, the, I see my time has expired. But suffice it to say, I think there actually is evidence that the stowage or negligence of the cargo, the way it was situated, definitely occurred in Texas. All right. Thank you, Mr. Lawrence. Your case is under submission. Final case for today, Sheldon v. Louisiana State.